U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 1 1 2005

ROBERT H. SHEMWELL, CLERK
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| WANDA F. JOHNSON | CIVIL ACTION NO.: 02-1468 |
| VERSUS | JUDGE LITTLE |
| COMM. OF SOCIAL SECURITY | MAGISTRATE JUDGE KIRK |

## REPORT AND RECOMMENDATION

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Wanda F. Johnson ("Johnson") Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under the Social Security Act ("SSA"). The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Johnson is not disabled and thus not entitled to disability and supplemental security income benefits.

Johnson was born in 1958, has a high school education (Tr. 178), and has past work experience as a cook and a presser at a dry cleaning store (Tr. 185). She protectively filed an application for DIB and SSI on June 20, 2000, alleging a disability onset date of February 21, 2000 (Tr. 150-51), due to depression, anxiety, right pelvic injury and hypertension (Tr. 13). Johnson's claim was denied initially, and a request for hearing was timely made. A hearing was held and a decision unfavorable to the claimant was rendered on May 20, 2002. Suit was filed in this Court and on March 5, 2003, the district judge entered a Judgment granting the Commissioner's unopposed motion to remand pursuant to the sixth sentence of 42 U.S.C. 405(g). (Tr. 88.) A subsequent hearing was held before the ALJ on September 18, 2003, at which the claimant and a vocational expert ("VE") appeared and testified. (Tr. 28-60.) Johnson was represented by counsel. A second

decision unfavorable to the claimant was rendered on April 23, 2004. The ALJ noted in her decision that, on September 30, 2002, Johnson had filed an additional application for DIB and SSI, which resulted in a finding that she *was* disabled as of **August 1, 2002**. (Tr. 12.) Therefore, the ALJ stated that her decision would only address the time period from **February 21, 2000 (the alleged onset date) through July 31, 2002**. (Tr. 12.)

To qualify for DIB, a claimant must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, a claimant must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. A claimant must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the

Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Issues

Johnson raises the following issues for review:

(1)    Whether the ALJ erred in assessing Johnson's residual functional capacity, resulting in an erroneous reliance upon the testimony of the vocational expert and finding that Johnson was not disabled at Step 5; and

(2)    Whether the ALJ erred in failing to accord proper weight to the treating and examining physician's opinions.

## Factual Background

Johnson was treated by Dr. Robert K. Rush in March 2000, after a slip and fall accident at work in December 1999. (Tr. 282.) She was the head cook for a catering company at the time. She developed pain in her lower back and left leg, with occasional pain in the right leg. (Tr. 282.) She continued to work despite her pain, and was seen at the emergency room on February 21, 2000 for an anxiety attack. She was taking hydrochlorothiazide and Lopressor for hypertension. She was prescribed Xanax by the emergency room physician for anxiety. (Tr. 282.) Upon examination, Dr. Rush noted good range of motion of the cervical spine without restrictions. Johnson could lumbar flex and touch her toes with difficulty. There was tenderness in the right sacroiliac joint with tightness and tenderness in the right piriformis muscle. Dr. Rush prescribed physical therapy, a gel-pak, Relafen for pain and soreness, and Desyrel at night for sleep disturbances due to depression. Dr. Rush recommended hot soaks for her back. (Tr. 283.)

Johnson underwent physical therapy from March 2000 through September 2000 at Louisiana Physical Therapy Center. (Tr. 396.) Initially, Johnson reported improvement with her right low back pain and hip pain, but still exhibited right piriformis tightness and SI ligament tenderness. (Tr. 391.) In May, Johnson continued to complain of low back pain, but acknowledged some

4

improvement. (Tr. 361.) Piriformis tightness was improved with palliative treatment. The physical therapist, Kevin Mayo, opined that Johnson should move toward strengthening to help her tolerate her normal activities without recurrent pain. (Tr. 361.) Mayo noted that Johnson was progressing and should be able to move toward pain-free status. (Tr. 356.) In June 2000, Johnson acknowledged improvement with her right hip and lower extremity. She had hypertonicity within the right piriformis musculature, as well as some right gluteus medius and gluteus maximus trigger point irritability, which had gradually improved with stretching. (Tr. 334.) The therapist noted that Johnson was making excellent progress. In July 2000, Johnson acknowledged overall improvement with her right hip pain, but continued with primarily piriformis irritability. (Tr. 328.) In September, the therapist noted that Johnson continued to complain of exacerbating and remitting right hip pain. Hyperirritability within the right gluteal and piriformis muscles was noted, as well as varying degrees of tenderness with palpitation of the sacroiliac ligaments on the right. (Tr. 300.) Johnson was placed in a sacroiliac stabilization belt. Mayo noted that he had not been able to progress with strengthening, as Johnson did not tolerate lumbopelvic stabilization very well. (Tr. 300.)

Johnson returned to Dr. Rush on September 12, 2000, "essentially at an impasse in the progression of her case." (Tr. 401.) The doctor opined that the lower right radiculopathy was due to piriformis syndrome and sacroiliac dysfunction. (Tr. 401.) Johnson had received maximum benefit from physical therapy, and was placed on a home exercise program. (Tr. 401.)

On November 22, 2000, an MRI of the lumbar spine was performed, showing normal marrow signal and alignment, some disc desiccation and disc height reduction at L4-5 and L5-S1, as well as some disc protrusion and bulge at those levels. (Tr. 411.)

Verma Devinder, M.D., saw Johnson on February 2, 2001, finding that Johnson suffered

from osteoarthritis involving the lumbosacral spine and right hip, history of back injury with possible lumbar radiculopathy, and history of depression and anxiety. (Tr. 418-419.) A neurosurgical consultation was performed by Lawrence Drerup, M.D., on March 13, 2001. Dr. Drerup noted right L5 root syndrome and symptom magnification. (Tr. 423.)

Johnson was treated by a psychologist, James W. Quillin, Ph.D., from May 2000 through June 2001. (Tr. 284-299, 481-487.) Initially, Johnson reported depression and anxiety due to slipping and falling on some water at work. (Tr. 297.) She continued to work after the slip and fall incident until she experienced chest pains due to stress. (Tr. 297.) She reported decreased energy and appetite. Johnson reported that she was taking Dexamethasone. Upon examination, Johnson was alert, friendly, and cooperative. (Tr. 298.)

Dr. Quillin conducted a Minneapolis Psychiatric Institute ("MPI") test, which showed that Johnson had a dysfunctional pain adjustment pattern. (Tr. 295-296.) Furthermore, Dr. Quillin found that the degree of interference Johnson was reporting was elevated while the sense of control she experiences over her pain is poor and below average. Her activity levels were fairly well retained. (Tr. 296.) Johnson's initial Minnesota Multiphasic Personality Inventory ("MMPI") test results were invalid, but a repeat test revealed some mild dysphoria and mild psychophysiologic discharge. (Tr. 294.) Some psychologic guarding was noted, and severe depression did not seem to be present. (Tr. 294.) On May 18, 2000, Dr. Quillin's diagnostic impression was mild psychophysiologic discharge with mild depression. (Tr. 294.) Dr. Quillin noted on May 26, 2000, that Johnson reported taking Prozac, Trazadone, Buspar, Relefan and Ultram, although the Trazadone was discontinued in June 2000. (Tr. 292.) Johnson had some mild dysphoria and mild psychophysiologic discharge. She was a good candidate for behavioral pain management as her

anxiety, depression and pain were likely related. (Tr. 292.)

Due to Johnson's complaints of headaches, Dr. Quillin ordered an SEMG study for the head, neck and shoulders, which returned abnormal results. (Tr. 291.) The SEMG study showed significant activation for the left posterior temporalis and right sternocleidomastoid and left paraspinals at C-4. Mild activation of the paraspinals was noted at T-2. (Tr. 289.) Johnson underwent SEMG directed biofeedback treatment for headache control (Tr. 286), which resulted in a "generally improved pattern of muscle contraction." (Tr. 285.) Other than some mild bilateral frontalis activation and some significant right anterior temporalis activation while seated, the findings were "essentially negative." (Tr. 285.)

By September 11, 2000, Johnson's mood was fairly stable and she was less anxious overall. (Tr. 400.) She responded well to cognitive behavioral intervention. From October 2000 through June 2001, Dr. Quillin noted that Johnson's depression was stable as was her panic disorder. (Tr. 481-487.)

A consultative psychological examination was performed by Milton Rhea, Ph.D., on January 25, 2001. (Tr. 413-416.) Dr. Rhea diagnosed depression, secondary to general medical condition and assigned a GAF score of 65-70[1]. Dr. Rhea noted that he trusted Dr. Quillin's findings as Dr.

---

[1] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. A GAF score of 61-70 indicates some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

7

Quillin had an ongoing treating relationship with Johnson. (Tr. 415.) Dr. Rhea opined that Johnson should be able to retain, understand, and follow simple instructions, and should be able to sustain attention and perform simple tasks under appropriate supervision.

William Berzman, Ph.D., conducted a mental residual functional capacity assessment on February 28, 2001. (Tr. 424-439.) Dr. Berzman found only moderate limitations of Johnson's ability to maintain attention and concentration for extended periods of time and ability to set realistic goals or make plans independently of others. Berzman found that Johnson's mental impairments would not limit her from all work activities. (Tr. 426.) On March 29, 2001, Gerald Dzurik, M.D., a physician with the state agency, performed a physical residual functional capacity assessment, finding that Johnson was limited to light exertional work with occasional climbing, bending, crouching, crawling, stooping, and kneeling. (Tr. 442.) Dr. Dzurik opined that Johnson could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk 6 hours in an 8 hour day, and could sit for 6 hours in an 8 hour day. (Tr. 441.)

Johnson was treated at Huey P. Long Medical Center from 1999 through 2003 for various complaints of pain. X-rays taken in 2001 showed some degenerative changes in the lumbar spine with narrowing at L5-S1 and facet joint hypertrophy at L4-L5 and L5-S1. (Tr. 624.) A 2002 MRI indicated a small posterior annular tear at L5-S1 with small disc protrusion. (Tr. 623.) In 2003, an MRI of the spine revealed normal cervical and thoracic spine and minimal disc bulge at L5-S1 that did not cause significant spinal canal or neural foramen stenosis. (Tr. 564.)

In November 2002, a psychological assessment was performed by C.G. Bellah, Ph.D. and Kelley Pears, Ph.D. (Tr. 670-672.) Johnson informed them that she suffered from four ruptured discs in her back. (Tr. 670.) She claimed that she could not pick up anything that weighs more than

five pounds. (Tr. 670.) Johnson reported that she was diagnosed with depression in 2002 and took Prozac. The diagnostic impression was dysthymic disorder.[2] A GAF score of 60 was assessed. (Tr. 672.)

Issue No. 1: Whether the ALJ erred in assessing Johnson's residual functional capacity, resulting in an erroneous reliance upon the testimony of the vocational expert and finding that Johnson was not disabled at Step 5

Upon prior remand, the district judge ordered that the ALJ identify the basis for the finding that Johnson had an RFC of limited light work. (Doc. #12.) In her most recent decision, the ALJ noted that in making an RFC determination, she must consider all symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 16.) In that regard, the ALJ considered Johnson's description of a rather sedentary lifestyle. However, the ALJ noted that the record indicated that Johnson's "near-sedentary existence" was self-imposed. (Tr. 16.) The ALJ pointed out that Johnson had not been performing the exercises recommended to strengthen her back. The judge found that no physician placed limitations on Johnson's complete ability to work, and the evidence did not establish that Johnson's ability to function had been so severely impaired as to preclude all types of work activity. (Tr. 16.) The ALJ found that Johnson's description of daily activities would be consistent with sedentary work, if not more. (Tr. 17.) Additionally, the record indicates symptom magnification (Tr. 423), indicating that Johnson made more of her limitations than was justified (Tr. 17). Therefore, the ALJ found that, for the period from February 21, 2000 through July 31, 2002,

---

[2]Dysthymia is a chronic form of depression, characterized by moods that are consistently low, but not as extreme or severe as other types of depression, such as major depression. www.medlineplus.gov

Johnson had the RFC to lift or carry 20 pounds occasionally and 10 pounds frequently. She could stand or walk for 6 hours in an 8 hour day, and could sit for 6 hours in an 8 hour day. She was limited to simple 1, 2, and 3 step instructions and needed to have limited contact with the public and coworkers. (Tr. 17.) The ALJ concluded that Johnson could perform a limited range of light work, which is more than sedentary work, because she could walk or stand for more than two hours in an 8 hour day.

The ALJ's determination is consistent with Dr. Dzurik's opinion in March 2001, that Johnson could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk 6 hours in an 8 hour day, and could sit for 6 hours in an 8 hour day. (Tr. 441.) Further, the medical records from a 2002 MRI indicated only a small posterior annular tear at L5-S1 with small disc protrusion. (Tr. 623.) In 2003, an MRI of the spine revealed normal cervical and thoracic spine with a minimal disc bulge at L5-S1 that did not cause significant spinal canal or neural foramen stenosis. (Tr. 564.) Therefore, the record supports the ALJ's RFC determination. Johnson argues that the ALJ failed to comply with the district judge's order by failing to obtain testimony of a medical expert at the hearing. The district judge did not order the ALJ to have a medical expert present at the hearing.

Johnson also argues that the ALJ erroneously relied on the testimony of the vocational expert ("VE") because the VE testified that an individual with *moderate* limitations in concentration, persistence, or pace would be significantly limited in the ability to obtain and maintain the jobs identified by the VE. (Tr. 58-59.) However, the ALJ found that Johnson had a *"mild to moderate"* limitation in the ability to maintain concentration, persistence, and pace. While Dr. Berzman, a non-examining physician, found moderate limitations of Johnson's ability to maintain attention and concentration for extended periods of time and in her ability to set realistic goals or make plans

independently of others, he found no limitations in all other areas of understanding, memory, concentration and persistence, social interaction, and adaptation. (Tr. 424-425.)

Johnson's treating physician, Dr. Quillan, found that, by September 11, 2000, Johnson's mood was fairly stable and she was less anxious overall. (Tr. 400.) From September 2000 through June 2001, Dr. Quillin found that Johnson's depression and panic disorder were stable and that she was responding well to treatment. (Tr. 481-487.) Similarly, Dr. Rhea opined that Johnson should be able to retain, understand, and follow simple instructions, and should be able to sustain attention and perform simple tasks under appropriate supervision. (Tr. 415.) Clearly the ALJ concluded that Johnson's limitation was *mild to moderate* based on the opinion of her treating physician and other evidence of record.

Johnson argues that the VE's testimony supports a finding that she could not maintain employment due to her impairments and the resulting functional limitations. Generally, there is no requirement that an ALJ make an explicit "regular and continuing basis" finding absent evidence of a waxing and waning nature of the claimant's symptoms, such that the impairments interfere with the claimant's ability to maintain employment on a continuing basis. See Singletary v. Bowen, 798 F.2d 818 (5th Cir. 1986) (mental impairments); Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002) (physical impairments); Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2003) (holding that it is a claimant's responsibility to first establish waxing and waning of symptoms). The Fifth Circuit stated that Watson involved a situation which, by its nature, the claimant's physical ailment waxed and waned in its manifestation of disabling symptoms, so that the issue of whether the claimant can maintain employment for a significant period of time is subsumed in the analysis regarding the claimant's ability to obtain employment. Since not every case involves a medical impairment of

such a nature (i.e., an impairment that "waxes and wanes") that separate consideration of whether the claimant is capable of maintaining employment is required, separate findings on obtaining and maintaining a job is not required in every case.

Nonetheless, in this case, the district judge ordered that, upon remand, the ALJ should obtain additional vocational expert testimony specifically addressing Johnson's ability to work on a "regular and continuing basis." (Doc. #12) The ALJ asked the VE whether a moderate limitation in concentration, persistence and pace, such that it would be hard for a claimant to maintain a steady work flow, would affect the job of assembly line worker over time. The VE testified that such a limitation would interfere with the consistency of productivity and would, over time, create a real problem. Still, the medical records during the relevant time period support a determination that Johnson's symptoms do not wax and wane such that the impairments would have interfere with the claimant's ability to maintain employment on a continuing basis.

Issue No. 2: Whether the ALJ erred in failing to accord proper weight to the treating and examining physicians' opinions

Next, Johnson argues that the ALJ erred in failing to accord proper weight to the treating and examining physicians. The ALJ noted that the relevant period for consideration was February 21, 2000 thought July 31, 2002. (Tr. 12.) Johnson was awarded benefits beginning August 1, 2002, as the result of a disability application filed on September 30, 2002. In determining whether Johnson was disabled prior to August 1, 2002, Dr. Quillin's reports from that time period should have been, and were, analyzed by the ALJ. Johnson points to a psychologic examination conducted by Dr. Quillin for DDS in August 2003, wherein Dr. Quillin opined: "[Johnson's] condition *at this juncture* is chronic.... Her prognosis is thus guarded to poor over the long term." (Tr. 576.) While Johnson's

12

condition was chronic in August 2003, Dr. Quillin found that Johnson's depression and panic disorder were stable during the relevant time period from 2000 through 2002. During that time frame, Johnson was responding well to behavior and medication therapy. An impairment that can be remedied or controlled with medication is not disabling. See Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988); Harper v. Sullivan, 887 F.2d 92 (5th Cir. 1989). The ALJ properly gave controlling weight to the findings of Dr. Quillin as Johnson's treating doctor. The ALJ's RFC assessment is consistent with Dr. Quillin's opinion during the relevant time period.

Based on the foregoing, the evidence does not establish a disabling impairment prior to July 31, 2002. While retrospective medical diagnoses can support a finding of past impairment, see Likes v. Callahan, 112 F.3d 189, 190 (5th Cir. 1997), there is significant evidence from the relevant time period in this case that indicates that Johnson's mental impairment was improving with treatment and was stable. Not only did Johnson's treating doctor's reports indicate that her condition was stable, but the opinion of Dr. Rhea, an examining source, was consistent with Dr. Quillin's opinion for that same time period. While an ALJ should make an effort to recontact a treating source when they provide opinions and the bases for such opinions are not clear, see SSR 96-5p, here Dr. Quillin's opinion is clear. From September 2000 through June 2001, Dr. Quillin's opinion was that Johnson was improving and stable. In 2003, Dr. Quillin noted that "at this juncture," Johnson's condition was chronic and, presumably, no longer stable.

Therefore, for the reasons set forth herein, I find that there is substantial evidence in the record to support the Commissioner's decision, and that the decision is consistent with relevant legal standards.

13

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Johnson's appeal be DENIED AND DISMISSED WITH PREJUDICE.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ___ day of August, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE